

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-20-00168-CV

_____

VICKI ALLRED AND CHARLES ALLRED, APPELLANTS

V.

FREESTONE COUNTY FAIR ASSOCIATION, INC., JASON MURRAY
D/B/A J&J RODEO COMPANY, AND JIMMY ADAMS, APPELLEES

On Appeal from the 146th District Court
Bell County, Texas
Trial Court No. 307,283-B; Honorable Jack Jones, Presiding

April 18, 2022

## MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

Appellant, Vicki Allred, a barrel racer, was seriously injured when she was struck by a rodeo arena gate while participating in a barrel race. She and her husband, Appellant, Charles Allred, sued multiple defendants for various causes of action. After several procedural maneuvers, many of the defendants were eliminated from the suit.

Directed verdicts were granted in favor Appellees, Freestone County Fair Association (FCFA) and Jason Murray d/b/a J&J Rodeo Company (Murray) on the Allreds' claims of negligence, negligent undertaking, and joint enterprise. Without specifying individual claims, the trial court also granted a directed verdict in favor of Appellee, Jimmy Adams, a rodeo judge. The remaining cause of action against FCFA and Murray, a premises liability claim, was submitted to a jury. Based on the jury's verdict, the trial court entered a judgment that the Allreds take nothing by their suit.

The Allreds have appealed and present four issues challenging that judgment. By their first issue, they maintain the trial court committed reversible error in excluding testimony from Rafe Foreman, in limiting testimony from Jackie Jatzlau, and in allowing Ed Colston, an untimely disclosed witness, to testify. By issue two, they assert reversible error by the trial court in excluding evidence of wind data. In issue three, they contend the trial court erred in granting motions for directed verdicts because they presented sufficient evidence to defeat those motions.[1] By their final issue, the Allreds argue the trial court's inclusion of an unavoidable accident instruction in the jury charge resulted in reversible error because they proved Vicki's injuries were avoidable. By reply brief, they expound on the arguments in their original brief.

FCFA, Murray, and Adams filed a cross-appeal presenting three issues. They contend (1) the Allreds' claims were precluded by the Farm Animal Activity Act,[2] (2) they were non-suited as defendants when they were omitted from the *First Amended Petition*,

---

[1] During the presentation of the motions for directed verdict, the Allreds' counsel conceded the evidence was insufficient to defeat the motion for directed verdict presented by Adams.

[2] TEX. CIV. PRAC. & REM. CODE ANN. § 87.003(4).

and (3) venue is proper in Freestone County, Texas, and not Bell County, if the case is remanded.[3]   We affirm.

## BACKGROUND

To better comprehend the issues before this court, a description of the process for producing a rodeo, the rodeo arena, and the duties of rodeo personnel is necessary. Generally, an association or group seeking to promote a rodeo enters into a lease with another party for use of an arena for rodeo events.  The association then negotiates with a rodeo producer or stock contractor to reach an agreement on the details of presenting a rodeo.  The stock contractor is responsible for bringing in livestock and hiring personnel such as an arena director, who coordinates events, judges for particular events, and gate men for certain events.[4]  For the barrel racing event, a pattern judge signals a racer to begin her run.  Generally, a rodeo also requires recruitment of numerous volunteers to fill various positions.

During a rodeo, which generally takes place over several days, many barrel racers register to compete.  Only a limited number are selected to race during the evening performances with the remaining races occurring during "the slack" event which occurs sans spectators.

---

[3] Originally appealed to the Third Court of Appeals, sitting in Austin, this appeal was transferred to this court by the Texas Supreme Court pursuant to its docket equalization efforts.  TEX. GOV'T CODE ANN. § 73.001.  Should a conflict exist between precedent of the Third Court of Appeals and this court on any relevant issue, this appeal will be decided in accordance with the precedent of the transferor court.  TEX. R. APP. P. 41.3.

[4] J&J Rodeo Company agreed to provide all stock, one secretary, two timers, two bullfighters, an announcer, a funny man, and two judges.

Usually, a barrel race takes sixteen to eighteen seconds to complete. The race consists of the rider and her horse entering the arena via the "out gate"—the gate located at the alleyway at one end of the arena which barrel racers use for ingress and egress during the event.[5] The racers run in a cloverleaf pattern around three properly spaced barrels and then exit the arena at approximately thirty miles per hour.



In the underlying case, FCFA entered into an agreement with the City of Fairfield in Freestone County, to promote a rodeo. FCFA then hired Murray to produce a rodeo on June 16 and 17, 2017. Murray in turn hired Adams as a pattern judge for the barrel racing event.

On the morning of June 17, 2017, Vicki and numerous other barrel racers competed in the slack event at the arena in Fairfield. Two witnesses testified that on the morning of the incident it was "a little breezy." The sound of the wind during Vicki's race

---

[5] The photo included with this opinion depicts the alleyway used by participants to enter and exit the arena. The gate in question that struck Vicki after she finished her barrel race is on the left side and has a sponsorship banner hanging on it.

can be heard on a video admitted into evidence. The out gate, which is hinged on one side and weighs approximately 600 pounds, had a sponsorship banner affixed to it but it did not have "wind cuts" in it.[6] Also, the latch on the out gate was rusted and was not tied back by a chain or rope.

The barrel racers who competed on the night before the slack and who competed just before Vicki that morning, did so without incident. Unfortunately, at the end of Vicki's performance, as she was exiting the arena on her horse at full gallop, the out gate began to blow shut, struck her, and hurled her to the ground. As a result, she was seriously injured and was transported by helicopter for medical treatment. The accident left her a tetraplegic.[7] The medical evidence showed she will require medical care for life.

Vicki and Charles sued numerous parties alleging multiple causes of action. After many defendants were eliminated from the suit, as relevant here, the claims of premises liability, negligence, negligent undertaking, and joint enterprise remained against FCFA, Murray, and Adams. At trial, the critical issue was whether the out gate presented a dangerous condition by not being tied back as a safety precaution. At the conclusion of the testimony of numerous witnesses, FCFA, Murray, and Adams, through their separate counsel, moved for directed verdicts. Although the trial court granted a directed verdict as to all parties as to negligence, negligent undertaking, and joint enterprise, as to FCFA and Murray, the issue of premises liability, with an instruction on unavoidable accident, was submitted to the jury. The jury returned a verdict finding Vicki's injuries were not

---

[6] Testimony showed there is always some sort of banner hung on the out gate to provide sponsorship and a visible boundary line for livestock.

[7] A tetraplegic is unable to use all four limbs as opposed to a paraplegic who loses the ability to use the lower extremities.

proximately caused by the negligence of either FCFA or Murray. Based on that verdict, the trial court entered a take-nothing judgment from which the Allreds appeal.

### ISSUES ONE AND TWO—RULINGS ON EXCLUSION AND ADMISSION OF EVIDENCE

By their first and second issues, the Allreds complain of the trial court's evidentiary rulings regarding the testimony of Rafe Foreman, Jackie Jatzlau, and Ed Colston. They also challenge the trial court's exclusion of wind data. They maintain that the erroneous exclusion of testimony from Foreman and Jatzlau and of wind data would have supported their claims of a dangerous condition. They also assert that the admission of Colston's testimony compounded the trial court's erroneous rulings.

A trial court's ruling related to the admission or exclusion of evidence is reviewed for abuse of discretion. *Southwestern Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 721 (Tex. 2016); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *Melton v. CU Members Mortg.*, 586 S.W.3d 26, 32 (Tex. App.—Austin 2019, pet. denied). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Gunn v. McCoy*, 554 S.W.3d 645, 666 (Tex. 2018); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The erroneous exclusion of evidence is harmful if it probably resulted in the rendition of an improper judgment. TEX. R. APP. P. 44.1.

#### ANALYSIS

#### Rafe Foreman

The Allreds designated Foreman as a retained expert. They allege the trial court should have allowed him to offer expert opinions on inspection and repair of arena gates,

alleyways, and whether the out gate that closed on Vicki presented an unreasonably dangerous condition. As relevant to the issues on appeal, Foreman's report offered the following opinions which he described as applying to "the duty of care applicable to all Defendants that sound in negligence and premises liability":

- a duty to use due care not to increase the risks to a participant in the barrel racing event

- exit gates in the barrel racing event, that fly open or swing open suddenly are not inherent risks

- but for the gate being unmanned or unsecured, this tragedy would not have occurred.

Foreman testified that he has over thirty years' experience as an attorney. Outside the jury's presence, he was questioned about his qualifications and the basis for the opinions in his expert report. He explained that he has experience with rodeos from his involvement in his daughters' participation in them for sixteen years. He has volunteered in various positions at numerous rodeos and describes his experience as "hands-on." For example, he has volunteered as a stock contractor, welder, contract negotiator, and announcer and has judged exhibitions and non-sanctioned rodeos. He does not, however, hold any licenses for professional rodeos.

Foreman further testified that in all his years involved with rodeos, he had never seen a gate blown shut because it is supposed to be tied back. He had "experience[d] a gate blowing shut when we hung a banner on it . . . but we just made sure there was a rope or a chain." In his opinion, a rusted latch on the gate, a banner without wind cuts hanging on the gate, and a failure to provide a gate man created an unreasonably

7

dangerous condition. Foreman acknowledged, however, that there are no rodeo regulations or standards for securing a gate.

The trial court ruled that Foreman would not be allowed to testify as an expert witness because his experience did not "rise to the level of being able to present expert testimony to this jury." The court noted that his testimony would "probably be given an unreasonably high level of credibility that is not founded and supported by [his] background and experience." Thereafter, Foreman made an offer of proof.

By his offer of proof, Foreman testified to his opinion on the condition of the gate and alleyway. His opinion that the gate presented a dangerous condition with a duty to warn was based on his review of depositions, pleadings and responses, photographs, maps, and rodeo rule books. But the "main basis of [his] testimony" was the video of Vicki's accident. He opined that there was "a very simple fix" to the gate by securing it with a sturdy rope or alternatively, having someone stand by the gate and hold it. Foreman offered his opinion that the gate presented "an unreasonably dangerous condition, it was faulty equipment, it was left in such condition as an intentional reckless disregard for the safety of the participants." To conclude his offer of proof, Foreman testified the defendants failed to exercise ordinary care for the safety and well-being of Vicki. Following his testimony, the trial court denied submission of the offer of proof.

The Allreds contend the trial court abused its discretion in excluding Foreman's expert testimony. They posit that he would have established the foreseeability of the wind blowing a gate shut if not secured. He also would have testified that placing a banner on the gate without wind cuts "put a sail" on the gate. Finding the trial court did not abuse

8

its discretion in excluding Foreman's testimony, we disagree with the Allreds' assessment.

Foreman did not have any specialized experience as a stock contractor or a rodeo producer. His rodeo experience was gained as a volunteer during the years his daughters competed in rodeos. He has never held a paying position in a professional rodeo. Nor does he have any formal training or hold any licenses or credentials from any rodeo sanctioning organizations. Furthermore, his proffered opinions were not necessary to assist the jury in understanding any scientific, technical, or specialized knowledge. He offered his opinion on safety precautions and premises defects based on his personal experience as a rodeo participant and not on any experience as a rodeo expert. As such, the trial court did not abuse its discretion in finding that Foreman's background did not qualify him as an expert witness on the issue of barrel racing safety and in excluding such testimony.

### Jackie Jatzlau

Jatzlau competed in the barrel racing event later in the day, following Vicki's accident. She testified that during her race, the out gate was tied back. In response to questioning during direct and cross-examination, she further testified that she could not recall ever seeing a gate that was not secured or staffed by a gate man.

The Allreds presented Jatzlau as a non-retained expert. They contend she was qualified to testify as an expert on the unreasonable risk that an unsecured gate presents during barrel racing. They argue that the excluded testimony would have shown that FCFA and Murray had the "ultimate responsibility for the gate." Jatzlau would have

9

established that FCFA and Murray were negligent in not securing the out gate or having a gate man. Again, we disagree with the Allreds' position.

It is undisputed that Jatzlau is a world champion barrel racer. She is also a horse trainer and a friend of the Allreds. She has twenty-five years' experience in barrel racing, including twenty years teaching the sport. Outside the jury's presence, she testified she was not present during the accident. She also testified that in preparation for her testimony, she reviewed the video of Vicki's accident and inspected the arena but did not review any discovery materials or depositions. She believed that her review of the video and the arena was sufficient for her to form an opinion. While she conceded there are no rules on securing gates, she personally inspects gates before she races.

The opinion the Allreds expected Jatzlau to provide for the jury was that failure to secure or tie back the out gate or provide a gate man during Vicki's race was negligent and proximately caused her injuries. Jatzlau defined negligence as when "they don't take action to provide a safe environment for somebody to run in." Initially, she opined that she was unaware of who had the responsibility for securing the gate but then testified "it is the responsibility of everyone to provide a safe environment." She admitted that she had no knowledge of premises liability issues. She testified that most waivers signed by participants include a provision that equine activities pose an inherent risk.

Jatzlau further testified that in all her years of barrel racing, she recalled the gates being tied back but conceded there is no rule requiring that a gate be secured. She admitted she has never seen an accident like Vicki's but attributed that fact to gates being secured.

During cross-examination, Jatzlau conceded she had never been consulted as an expert on whether a gate should be tied back. She acknowledged that she did not have any education or training on the issue. She further acknowledged that she had no involvement in making decisions as a rodeo promoter regarding whether to tie back a gate.

After Jatzlau was presented as an expert, the trial court ruled she would only be permitted to testify to her personal knowledge and experience and found that "she's an expert on barrel racing itself."[8] The court also found that "as far as setup and safety of the arena, I do not find that she has expertise in that area. She'll not be able to give any opinions on those topics." The court clarified, "[s]he cannot give any opinions as to . . . what the effect is of tying the gates back." The court also prohibited Jatzlau from offering an opinion on inherent risks regarding the arena facilities, specifically, whether a gate striking a rider is an inherent risk.

During Jatzlau's testimony before the jury, the trial court permitted more testimony than its prior ruling indicated. Even so, her own testimony supports the trial court's ruling to limit her opinions to lay opinions under Rule 701 of the Texas Rules of Evidence. The trial court acknowledged that Jatzlau is an expert in barrel racing but lacked qualifications or credentials to testify as an expert on negligence or premises liability. Jatzlau conceded there was no rule or standard of which she was aware that required an out gate to be secured during barrel racing. When questioned, she yielded to a lack of experience as a stock contractor and rodeo promoter. She had no education or specialized training to

---

[8] Jatzlau was permitted to offer opinion testimony as a lay witness under Rule 701 of the Texas Rules of Evidence. TEX. R. EVID. 701.

11

testify as an expert on how an out gate should be managed during a barrel racing event. Based on the lack of Jatzlau's qualifications, the trial court did not abuse its discretion in limiting her testimony to lay testimony or in limiting her ability to testify as an expert witness.

**Ed Colston**

After the Allreds rested their case on a Friday afternoon, FCFA also rested. Murray, however, advised the court that he wished to call another witness on the following Monday. When the trial resumed that day, Murray called Colston, a retired rodeo judge, to testify as a rebuttal witness to impeach Jatzlau's testimony on whether an out gate must be secured during barrel racing. The Allreds objected on the ground that Colston's testimony was inadmissible and irrelevant, and he was not timely disclosed in any discovery documents or a trial witness list. The trial court overruled the objection noting for the record that one of the grounds was failure to timely disclose Colston as a witness.[9]

The Allreds contend there was no good cause in admitting Colston's testimony and doing so caused them unfair surprise and prejudice. A party is not required to disclose the identity of rebuttal or impeaching witnesses whose testimony was not reasonably anticipated before trial. TEX. R. CIV. P. 192.3(d). An unexpected need for a rebuttal witness may, under certain circumstances, constitute good cause. *Aluminum Co. of Am. v. Bullock*, 870 S.W.2d 2, 4 (Tex. 1994). Murray, as the proponent of Colston's testimony, had the burden to establish good cause and the Allreds, who claimed unfair surprise or

---

[9] Rule 193.6(a) of the Texas Rules of Civil Procedure provides that a party who does not timely disclose material or information may not introduce such as evidence unless the court finds that (1) there was good cause for the failure to timely make, amend, or supplement the discovery response or (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties. TEX. R. CIV. P. 193.6(a).

prejudice, had the burden to establish that Murray had enough evidence to reasonably prepare rebuttal to Jatzlau's testimony. *F1 Constr. Inc. v. Banz*, No. 05-19-00717-CV, 2021 Tex. App. LEXIS 401, at *5 (Tex. App.—Dallas Jan. 20, 2021, no pet.) (mem. op.).

The Allreds presented Jatzlau as an expert "in all aspects of barrel racing. She's going to talk about negligence and reckless disregard." The Allreds continued, "[s]he's going to be opining upon inherent risks on expectations of barrel racers, on how these gates are supposed to be managed during a barrel race."

During Jatzlau's testimony, it was counsel for the Allreds that elicited her testimony that the out gate is always tied back during barrel racing. Specifically, the questioning was as follows:

> Q. Have you ever seen one that was not tied back in any of the rodeos that you've been to?
>
> A. Not that I can recall. *Gates are always secured back*.

(Emphasis added).

The Allreds had not previously disclosed that Jatzlau would be offering testimony that an out gate should always be tied back. Murray argued that Colston's testimony was necessary to rebut Jatzlau's testimony. After the trial court overruled the Allreds' objection, Colston was permitted to testify.

Colston testified he had been a rodeo judge for over forty years. He further testified to his familiarity with Jatzlau's career as a barrel racer and he had judged many races in which she had participated. He disputed that she had always raced with gates that are tied back. In all his years as a judge, he had "never tied a gate" and had never seen a

13

gate tied back for safety reasons. One of his concerns was that if a gate is tied back and a need arises to quickly shut it for safety reasons, a judge would not be able to do so.

During cross-examination, when asked if the persons in charge who actually possess or have control of the arena are responsible for preventing a gate from shutting on a participant, he testified "I've never heard of anybody assigned to a gate because the gate is not supposed to be tied for the safety reason of something happening in the arena." He could not provide an answer on who is responsible for controlling an out gate. He also testified that contestants are responsible for accepting the arena "as it is" and exercising "the right to run or not to run." However, when asked who was responsible for checking the safety of the alleyway, he placed that responsibility on the judges and the arena director.

As previously noted, whether the out gate should have been secured during Vicki's barrel race was a critical issue at trial. Murray could not have anticipated before trial that Jatzlau would testify that she had always competed in barrel racing with the out gate tied back. There was good cause for the trial court to allow Colston to testify in rebuttal to Jatzlau's testimony concerning the out gate. Also, it was the Allreds' counsel who produced the testimony making a claim of surprise and unfair prejudice disingenuous. We find the trial court did not abuse its discretion in permitting Colston to testify in a limited capacity to impeach Jatzlau's testimony.

**Wind Data**

During a pretrial hearing, the trial court considered the authenticity of Exhibit Number 1 which was wind data from an airport in Mexia, Texas,[10] located approximately thirty miles from the rodeo arena in Fairfield. The Allreds contend the excluded wind data would have established that Mexia was having a windy week with a maximum wind speed of twenty-three miles per hour on June 16 and eighteen miles per hour on June 17, the date of the accident. According to the Allreds, the wind data was relevant and highly probative of foreseeability that the banner without wind cuts hanging on an unsecured gate posed an unreasonable risk of harm and would have also shown the failure to exercise reasonable care under the circumstances.

FCFA objected to the wind data from Mexia which was taken from a website and offered without expert testimony as being irrelevant, lacking proper foundation, and being misleading and confusing. The trial court expressed apprehension that wind data from almost thirty miles away could be misleading and ruled "I would be *inclined* to exclude the - - that wind data."

Notwithstanding exclusion of the wind data from the Mexia airport, FCFA, Murray, and Adams note that the record contains other evidence regarding wind conditions. Although the Allreds' counsel urged at least twice in his opening statement that when Vicki ran her race, it was "a very, very windy morning," two witnesses described wind conditions as "a little breezy." Sid Fryer, FCFA's chairman, and Murray both testified they

---

[10] Vicki's counsel advised the trial court that weather data is not recorded in Fairfield and the Mexia airport was the nearest location with weather data. The excluded wind data showed that the wind at the Mexia airport between June 14 and June 17 ranged from sixteen miles per hour to twenty-three miles per hour.

could hear the wind on the video of the accident. Murray confirmed that the video showed tarps he had hung for shade flapping in the wind. Adams testified that from where he was, "it was a still day." But he acknowledged "there was a gust of wind that came up at that point." Testimony showed that over the course of the entire rodeo, hundreds of performances occurred without incident attributable to windy conditions.[11] The jury heard ample evidence of the wind conditions so as to render error, if any, in excluding the wind data from the Mexia airport harmless. Issues one and two are overruled.

### ISSUE THREE—DIRECTED VERDICTS ON NEGLIGENCE, NEGLIGENT UNDERTAKING, AND JOINT ENTERPRISE

By their third issue, the Allreds maintain the trial court erroneously granted directed verdicts on their causes of action for negligence, negligent undertaking, and joint enterprise. They assert that the trial court's erroneous evidentiary rulings notwithstanding, they still presented legally sufficient evidence to defeat the various motions for directed verdict.

A directed verdict is warranted when the evidence is such that no other verdict can be reached, and the moving party is entitled to judgment as a matter of law. *Bergquist v. Lamar Gateway Baceline Holdings, LLC*, No. 03-19-00096-CV, 2020 Tex. App. LEXIS 5762, at *14 (Tex. App.—Austin July 24, 2020, no pet.) (mem. op.). We review the propriety of a directed verdict in the same manner as a legal sufficiency challenge. *City of Keller v. Wilson*, 168 S.W.3d 802, 823, 827-28 (Tex. 2005). We examine the evidence in the light most favorable to the party against whom the verdict was directed and we

---

[11] Although the Allreds assert that the opposition was "downplaying the wind," the evidence from their own witnesses that it was "a little breezy" is contrary to their counsel's remark that it was "a very, very windy morning" when Vicki was injured.

disregard all contrary evidence and inferences. *Id.* at 824. If there is any conflicting evidence of probative value that raises a material fact issue on any theory of recovery, a determination of that issue is for the jury. *Democracy Coalition v. City of Austin*, 141 S.W.3d 282, 288 (Tex. App.—Austin 2004 no pet.).

In Texas, a person injured on another's property has two potential causes of action: (1) a negligence claim or (2) a premises liability claim for an unreasonably dangerous condition on the premises. *Marek v. Slayden*, No. 03-20-00439-CV, 2022 Tex. App. LEXIS 85, at *5-6 (Tex. App.—Austin Jan. 7, 2022, no pet.) (mem. op.). A negligence claim consists of a legal duty, a breach of that duty, and damages proximately caused by the breach. *Praesel v. Johnson*, 967 S.W.2d 391, 394 (Tex. 1998). The threshold inquiry in a negligence case is duty—the plaintiff must establish both the existence and violation of a duty. *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). A premises liability claim is a special form of negligence where the duty owed to a plaintiff depends on the status of the plaintiff at the time the incident occurred. *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). Duty remains a threshold inquiry. *City of Austin v. Membreno Lopez*, 632 S.W.3d 200, 211 (Tex. App.—Austin 2021, pet. filed) (citation omitted).

The elements of a premises liability claim are as follows:

(1)     the premises owner or occupier had actual or constructive knowledge of some condition on the premises;

(2)     the condition posed an unreasonable risk of harm;

(3)     the owner or occupier did not exercise reasonable care to reduce or to eliminate the risk; and

  (4)  the owner or occupier's failure to use such care proximately caused the plaintiff's injuries.

*See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017) (citation omitted) (detailing requirements of a landowner's duty to an invitee to use ordinary care to reduce or eliminate an unreasonable risk of harm presented by a premises condition). But in a premises liability case, "the traditional test of the conduct of a reasonably prudent person is simply tailored to a specific category of defendants—owners or occupiers of premises." *Id.* (citation omitted). The scope of an owner's or occupier's duty varies depending on whether the plaintiff is an invitee, licensee, or trespasser. *Id.* (citation omitted).

  "Negligent activity and premises liability claims 'involve closely related but distinct duty analyses.'" *Levine*, 537 S.W.3d at 471 (citation omitted). In a negligent activity case, to avoid liability an owner or occupier must "do what a person of ordinary prudence in the same or similar circumstances would have . . . done." *Id.* (citation omitted). Whereas, in a premises liability case, an owner or occupier must "use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier knows about or in the exercise of ordinary care should know about." *Id.* (citation omitted).

  At issue in the underlying case was the proximate cause of Vicki's injuries. Was the cause a negligent activity or a condition created by a negligent activity—a premises defect? According to the Allreds' live pleading, their *Third Amended Original Petition*, they alleged that Vicki was an "invitee-participant" at the rodeo and FCFA, Murray, and Adams "possessed the rodeo arena premises at all times in question." They further alleged that FCFA, Murray, and Adams were conducting an "inherently dangerous

activity" and had a "legal duty to assure that those selected to run the rodeo events were competent to safely run the rodeo events." The allegations continued that the out gate was "faulty equipment" because it did not have "a permanently installed latch or mechanism to secure" it during Vicki's barrel race and because FCFA, Murray, and Adams "knew or should have known" the gate was "faulty." During opening statements, counsel for the Allreds referred to the persons in charge of the rodeo being responsible to assure the out gate was not in a "defective condition." He also commented that the responsible parties "made a defective gate more defective by hanging [the banner] on there."

As pointed out by FCFA and Murray, the Allreds' allegations sound in premises liability and not in negligence and the trial court properly submitted a premises liability question to the jury.[12] They contend the Allreds engaged in "creative pleading" to avoid the heightened standard for a premises defect claim. *See Sampson v. University of Texas*, 500 S.W.3d 380, 386 (Tex. 2016). The Allreds presented their case on a theory that the occupiers of the rodeo arena, FCFA and Murray, failed to use ordinary care to eliminate an unreasonable risk of harm—an unsecured out gate—of which they had knowledge and that created an unreasonably dangerous condition. The Allreds' allegations targeted a condition of the premises they claimed was defective—the unsecured out gate—and the occupiers' failure to use ordinary care to eliminate that defective condition.

---

[12] Relying on Rule 279 of the Texas Rules of Civil Procedure, Adams contends any complaints on appeal regarding negligence or negligent undertaking by him were waived because the Allreds failed to request jury charge questions on those claims. The record clearly shows that Adams was granted a directed verdict as to premises liability after the Allreds' counsel conceded there was no evidence that Adams was an owner or occupier of the premises or had any control over the allegedly dangerous condition.

In addition to the Allreds' allegations, FCFA and Murray assert the evidence presented at trial and the issues presented on appeal likewise support a premises liability claim. The Allreds sought to show that FCFA and Murray created a dangerous condition and failed to exercise reasonable care to eliminate or reduce the risk of injury that might result from that condition.

### Negligence and Negligent Undertaking[13]

Even with the Allreds' characterization of their claims as sounding in negligence and negligent undertaking, they did not present sufficient evidence to defeat the motions for directed verdict. Negligence "means the doing of that which a person of ordinary prudence would not have done under the same or similar circumstances." *20801*, *Inc. v. Parker*, 249 S.W.3d 392, 398 (Tex. 2008) (citation omitted). The elements of negligence are (1) the existence of a legal duty, (2) a breach of that duty, and (3) damages proximately caused by the breach. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017).

A claim of negligent undertaking may arise when a person undertakes to provide services to another, either gratuitously or for compensation. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000). One who undertakes to render services for the protection of another's person or things is subject to liability to the other for physical harm resulting from the person's failure to exercise reasonable care to perform the undertaking

---

[13] The Allreds allege the trial court erred in the manner in which it granted the motions for directed verdict with respect to the claim of negligent undertaking. The trial court announced its ruling as applying to "the issues involving negligence, joint enterprise, and gross negligence." FCFA's counsel then asked, "[d]oes that include negligent undertaking . . . .?" The trial court responded, "when I say 'negligence,' all of the negligence issues other than the premises defect issue." The Allreds' complaint is not well taken as they did not object to the trial court's ruling. *See* TEX. R. APP. P. 33.1(a).

if: (a) the failure to exercise such care increases the risk of harm or (b) the harm is suffered because of the other's reliance on the undertaking. *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 323 (1965)).

The Allreds contend that Murray and Adams owed a duty of care to put on a safe rodeo and were negligent in failing to do so and in failing to stop the rodeo, tie back the gate, or add a gate man. The arguments are based on the fact that the out gate had a rusted latch and was not tied back for the barrel racing event.

Relying on the dissent in *Phi Delta Theta Co. v. Moore*, 10 S.W.3d 658, 662 (Tex. 1999), and on *Chrismon v. Brown*, 246 S.W.3d 102, 111-12 (Tex. App.—Houston [14th Dist.] 2007, no pet.), the Allreds argue that an ordinary negligence standard should apply to injuries resulting from a sport in which the injury-causing risk is not inherent to that sport. They maintain they produced overwhelming evidence that an injury resulting from an out gate is not an inherent risk of barrel racing.

Although the Allreds were critical of the admission of Colston's testimony, they rely on it to support their contention that Murray and Adams were negligent in allowing Vicki to race. Colston, however, declared that rodeo participants are responsible for accepting an arena "as it is" and choosing to run or not run based on the current conditions. Furthermore, the undisputed evidence showed there is no rule or standard requiring an out gate to be secured during barrel racing. FCFA's chairman, Sid Fryer, testified that in all his years involved with rodeos, he had never seen an out gate tied back and that a safety issue arises if a gate is tied back. During the testimony from Murray and Adams, each elaborated on why a gate that is tied back creates a safety concern. They both

21

testified that most accidents happen inside the arena and a gate has to be shut quickly to prevent livestock from exiting the arena. Murray explained that a properly tied gate creates a greater risk of injury because it would take too long to shut the gate while "fumbling with a tie, rope, or chain." Adams described a runaway horse as "a little bit blinded" and could produce the same effect as a stampede.

Murray testified he conducted a safety check of the arena on the morning of the accident and it was not windy at that time. He did, however, admit that he "could hear the wind blowing in [the] video." Later in his testimony when the Allreds' counsel asked, "[y]ou knew it was windy?", Murray answered, "[i]t was not windy when [the barrel race] started." He testified "[t]hat wind came from nowhere." During cross-examination, Murray was asked if he ever had any reason to believe the gate might close "by a gust of wind" to which he replied, "[n]ever."

Adams testified that he never observed the out gate moving before clearing Vicki for her race. He described the morning of the accident as a "still day" but acknowledged that a "gust of wind came up" suddenly. Murray testified that placing a gate man in the alleyway could have presented a liability issue if the gate man was injured by livestock running toward the gate at full speed. He added that barrel racers have never recommended that gates be tied back as the industry standard.

The Allreds presented testimony from an experienced barrel racer, other than Jatzlau, who raced immediately before Vicki. She claimed to have seen the out gate move three to four inches but attributed it to what she assumed was slack from the gate

22

being tied back. During cross-examination, she testified that she did not alert anyone about the gate's movement because it would have been "laughable."

Testimony also established that over the course of the entire rodeo, numerous events occurred before Vicki's accident without any incidents attributable to windy conditions. Murray testified that more than 300 runs occurred during a youth rodeo on Wednesday, ten barrel races occurred on Friday night, and twenty participants competed on Saturday morning before Vicki's race—all without the out gate being tied back or being blown shut by wind.

The Allreds assert they presented *some* evidence of negligent undertaking by FCFA and Murray in failing to inspect and repair the arena, out gate, and alleyway sufficient to defeat their motions for directed verdict. With respect to FCFA, the Allreds contend that it negligently undertook inspection and repair of the arena. Specifically, they allege that FCFA's failure to repair the rusted latch on the out gate and the act of hanging a banner without wind cuts on the out gate acted as a sail and created a more dangerous condition. Murray, the Allreds argue, negligently undertook inspection of the out gate during his safety inspection and intentionally chose not to tie back the gate.

To reiterate, FCFA's chairman, Murray, and Adams all testified that tying back a gate creates more of a risk than leaving the gate unsecured. In all their years of rodeo experience, they had never witnessed a gate being blown shut by wind making Vicki's accident unforeseeable. There was no evidence to suggest that the arena itself posed a dangerous condition and an inspection of the alleyway prior to Vicki's race would not have

shown that it was blocked because the out gate did not close until after Vicki had completed her race.

We conclude the evidence is insufficient to show that FCFA and Murray were negligent or that they engaged in a negligent undertaking in not securing the out gate near the alleyway. Even under a common law negligence theory, the trial court did not err in granting FCFA's and Murray's motions for directed verdict.

### Joint Enterprise Liability[14]

Joint enterprise liability is a form of *vicarious liability* by which courts "impute liability to one who was not an active wrongdoer but who is so closely connected to the wrongdoer to warrant the imposition of vicarious liability." *Conkle v. Chery*, No. 03-08-00379-CV, 2009 Tex. App. LEXIS 1385, at *16 (Tex. App.—Austin Feb. 25, 2009, no pet.) (mem. op.). Joint enterprise liability is not an independent claim or cause of action and the imposition of liability under this theory is dependent upon the *primary liability* of a wrongdoer who is a part of the joint enterprise.

The elements of joint enterprise are as follows: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. *See Texas DOT v. Able*, 35 S.W.3d 608, 613 (Tex. 2000) (citing RESTATEMENT (SECOND) OF TORTS § 491 cmt. c (1965)). *See also City of Austin v. Quinlan*,

---

[14] In their reply brief, the Allreds clarify they were arguing joint enterprise liability and not joint venture liability as presented in their original brief.

24

No. 03-21-00067-CV, 2022 Tex. App. LEXIS 670, at *23 (Tex. App.—Austin Jan. 28, 2022, pet. filed) (mem. op.). "A 'community of pecuniary interest' refers to a monetary interest that is 'common among the members of the group—it must be one shared without special or distinguishing characteristics.'" *Quinlan*, 2022 Tex. App. LEXIS 670, at *23 (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 531 (Tex. 2002)). It is not sufficient to show that each member of the group benefitted financially in some way; rather, there must be evidence of "shared financial resources, pooled funds, or joint monetary investments in the enterprise." *Quinlan*, 2022 Tex. App. LEXIS 670, at *24 (citing *Able*, 35 S.W.3d at 614).

FCFA leased the arena from Fairfield to host the rodeo. FCFA then entered into an agreement with Murray as stock contractor to promote the rodeo. The agreement provided that Murray would provide the following:

1. All Stock
2. 1 Secretary
3. 2 Timers
4. 2 Bullfighters
5. Announcer
6. Funny Man (Cap on Funny man will be $2,500 per agreement)
7. 2 Judges

The agreement continued that J&J Rodeo "[would] share the expenses of Announcer and Contract Act for a 50/50 split of All ticket sales . . . ." In this case, the only disputed element of a joint enterprise is a community of pecuniary interest.

The Allreds contend that FCFA and Murray were engaged in a joint enterprise because they shared a pecuniary interest, that is, "a monetary interest" by agreeing to a "50/50 split" on all ticket sales. This, they conclude was a joint enterprise because FCFA

25

and Murray agreed to "put on the rodeo together and to share the [ticket] sales and expenses of the rodeo."

The agreement between FCFA and Murray and Murray's testimony show they were not involved in a joint enterprise. Murray testified that the agreement to split ticket sales referred to pre-sale tickets and a split of "the actual gate money." However, he did not share in any profits or losses from the rodeo. Although the Allreds assert that FCFA and Murray "also split expenses," they did so only for the announcer and contract act (funny man) and not for the other five items specified in the agreement. The Allreds maintain that not all expenses need be shared to establish a joint enterprise but cite to no authority supporting that argument. According to Murray, only FCFA benefitted financially from all entry fees. Also, Murray did not profit from any concession stand revenues nor did he assist financially in cleanup after the rodeo.

FCFA and Murray rely on *Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary*, 58 S.W.3d 263, 275-76 (Tex. App.—Fort Worth 2001, pet. denied), to support their argument that they were not engaged in a joint enterprise. In *Blackburn*, the parties, one of which was an independent contractor, entered into an agreement to improve the quality of and maintain a reasonable cost for medical care furnished to hospital patients. The agreement specified certain financial responsibilities of each party. *Id.* at 275. The appellate court found that a symbiotic relationship between the parties notwithstanding, evidence of general benefits to each did not establish a community of pecuniary interest. *Id.* at 276. Also, the court found that the status of one of the parties as an independent contractor, such as Murray, supported the conclusion that the parties were not involved in a joint enterprise. *Id.* at 277. More than a shared business purpose in promoting a

26

rodeo was required to find the existence of "a community of pecuniary interest." *Id.* at 276.

Based on this record, we find that FCFA and Murray's agreement and Murray's testimony on the specifics of that agreement negate a showing of a "community of pecuniary interest" between them. Thus, even viewing the evidence in the light most favorable to the Allreds, we conclude the trial court did not err in granting FCFA's and Murray's motions for directed verdict on the claim of joint enterprise.

In any event, having failed to obtain a finding of liability as to any party, the granting of a directed verdict on the Allreds' claim of joint enterprise was harmless. Having found the trial court did not err in granting the motions for directed verdict of FCFA, Murray, and Adams, we overrule the Allreds' third issue.

### ISSUE FOUR—UNAVOIDABLE ACCIDENT INSTRUCTION

By their fourth issue, the Allreds assert the trial court committed reversible error in charging the jury on unavoidable accident. We review a trial court's decision to submit a jury instruction for abuse of discretion. *Towers of Town Lake Condo. Ass'n v. Rouhani*, 296 S.W.3d 290, 300 (Tex. App.—Austin 2009, pet. denied) (citing *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999)). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Low v. Henry*, 221 S.W.3d 609, 619-20 (Tex. 2007). To obtain reversal of a judgment for claimed jury charge error, a party also must show that the error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1); *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006).

27

Rule 277 of the Texas Rules of Civil Procedure provides that "the court shall submit instructions and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. An unavoidable accident is "an event not proximately caused by the negligence of any party to it." *Gunn*, 554 S.W.3d at 675 (quoting *Reinhart v. Young*, 906 S.W.2d 471, 472 (Tex. 1995)). The purpose of an unavoidable accident instruction is to "advise the jurors, in the appropriate case, that they do not have to place blame on a party to the suit if the evidence shows that conditions beyond the party's control caused the accident in question or that the conduct of some person not a party to the litigation caused it." *Rouhani*, 296 S.W.3d at 300 (citing *Dillard v. Texas Elec. Co-op*, 157 S.W.3d 429, 432 (Tex. 2005)). An unavoidable accident instruction must be supported by the evidence. *Rouhani*, 296 S.W.3d at 300 (citing *Hicks v. Brown*, 136 Tex. 399, 151 S.W.2d 790, 792 (1941)). Such an instruction is proper only when there is evidence that the event was proximately caused by a nonhuman condition. *Gunn*, 554 S.W.3d at 675 (citation omitted). But an instruction is generally not warranted when there is no evidence that the accident was caused by some such peculiar circumstance not associated with the negligence of either party. *Hicks*, 151 S.W.2d at 792. It is within the trial court's discretion to submit an avoidable accident instruction when the evidence supports the conclusion that no one was negligent. *Urista*, 211 S.W.3d at 760 (Brister, J., concurring).

**ANALYSIS**

The Allreds point out that the defense's theory of the case was that Vicki's accident was not caused by any party. They maintain the trial court's evidentiary rulings, which they allege were erroneous and which this court has already resolved against them, aided the defense's case leaving the jury with no option but to accept the theory of unavoidable

28

accident. They urge that the instruction was erroneous because the parties were negligent and Vicki's injuries would have been avoided if reasonable care had been exercised by securing the out gate.

The evidence at trial showed that the out gate was blown shut by a nonhuman condition—wind that "came at a very bad time. That wind came from nowhere." Although the wind noise can be heard on the video of Vicki's accident, the evidence showed that numerous rodeo contestants participated in events the day and night before the accident as well as on the morning of the accident without incident. Two barrel racers testified it was "a little breezy." There was no evidence to suggest that the wind was a dangerous factor before Vicki's race. The sudden wind that caused the out gate to close was the proximate cause of Vicki's injuries and was beyond the control of FCFA and Murray. Additionally, some witnesses with years of rodeo experience testified that securing the out gate for barrel racing was not the norm and to do so would have created an unsafe condition if an accident had occurred inside the arena and the gate needed to be closed quickly to prevent livestock from leaving the arena. Under the record in this case, the trial court was free to reject contrary evidence that the out gate should always be secured for barrel racing. As such, we find the trial court did not abuse its discretion in including an unavoidable accident instruction in the jury charge. Issue four is overruled.

### CROSS-APPEAL

By three cross-issues, FCFA, Murray, and Adams assert that (1) the Allreds' claims were precluded by section 87.003(4) of the Farm Animal Activity Act, (2) the Allreds non-suited them when they removed them as defendants from the *First Amended Petition*,

29

and (3) if the case is reversed and remanded, venue is proper in Freestone County where the case was originally filed and not Bell County.

Our disposition of the Allreds' issues renders consideration of the cross-issues unnecessary. *See* TEX. R. APP. P. 47.1.

**CONCLUSION**

The trial court's judgment that the Allreds take nothing is affirmed.

Patrick A. Pirtle
Justice

Quinn, C.J., concurring in the result.